THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NATHANIEL W. THOMPSON, Defendant-Appellant.

Fourth District   No. 4—90—0835

Opinion filed June 26, 1991.—Rehearing denied August 8, 1991.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

John B. Huschen, State's Attorney, of Eureka (Kenneth R. Boyle, Robert J. Biderman, and Beth McGann, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LUND delivered the opinion of the court:

On August 31, 1990, defendant Nathaniel Thompson was found guilty by a jury sitting in the circuit court of Woodford County of

committing the offenses of possession of a controlled substance with intent to deliver and possession of a controlled substance. (Ill. Rev. Stat. 1989, ch. 56½, pars. 1401(a)(2), 1402(a)(2).) Defendant was subsequently sentenced to six years' imprisonment on the delivery offense. He now appeals, alleging the trial court erred in denying his motion to suppress evidence and he was not proved guilty beyond a reasonable doubt. We affirm.

On April 23, 1990, defendant was charged with the instant offenses involving more than 15 but less than 100 grams of a substance containing cocaine. Defendant filed a motion seeking to quash his arrest and suppress the evidence seized. The motion alleged that defendant was improperly arrested in that he was arrested simply because of his presence with other persons who were arrested. Accordingly, he sought to suppress the substance seized subsequent to the arrest. The court denied the motion in a pretrial hearing and again when defendant renewed it during trial.

The evidence establishes that on April 22, 1990, at approximately 4:30 a.m., Metamora police officers Jeff Wernsman and Allen Smallwood were on duty in separate patrol cars. Auxiliary police officer Herbert Raaf was riding with Wernsman. At that time, Wernsman had stopped a vehicle for a defective taillight. Smallwood responded to the scene. The car was driven by a black female. After a warning, they let the car proceed. At that point, they received a report over the radio—in response to a request for a vehicle check by Wernsman—that, if a black female was driving the car, her driver's license was suspended. The officers then proceeded to follow and stop the car to investigate this possibility. This stop occurred approximately four miles outside the Metamora city limits.

Wernsman then spoke with the driver, Yvonne Pollard, and discovered she had a suspended license. At the time of the stop, there were four people in the car. The driver was Pollard. Sharon Slaughter was in the front passenger seat. Antonio Pullman and defendant were in the rear seat. Smallwood believed Pullman was on the passenger side and defendant was on the driver's side. It was later discovered that the car belonged to Slaughter's mother. Once Pollard was placed under arrest, Smallwood asked the others for identification or a driver's license. He explained he was attempting to ascertain if someone would be able to drive the car. Slaughter said she had a ticket and the men gave no response. He then asked all of them to exit the car. He did so because he was having trouble hearing what the men in the backseat were saying.

After they exited the car, Wernsman observed the barrel of a handgun sticking out from under the passenger seat. He took the gun from the car and unloaded it. In response to Smallwood's question, Pullman stated the gun belonged to him. At this point, all the subjects were placed in the police cars to be taken to the station. At the motion to suppress, Smallwood stated this was done for the officers' protection. However, at trial, he explained that all were placed under arrest for an unlawful-use-of-weapons charge (Ill. Rev. Stat. 1989, ch. 38, par. 24—1(a)(4)), based on the handgun.

Once they arrived at the station, Smallwood began typing reports in one room. In that room with him were defendant and Pollard. They sat in chairs behind Smallwood, next to a cabinet upon which sat a small file box used to keep bicycle safety stickers. While Smallwood worked on the reports, Raaf waited in the hallway and watched the subjects. Raaf was able to watch through the door and see defendant and Pollard in a large mirror. After about 10 minutes, he saw defendant place a bag in the bicycle safety box and close the box.

Raaf then entered, picked the box up, and placed it on a desk in the sergeant's office. Slaughter was seated in the office at the time. He then went to get Officer Wernsman, which took less than one minute. The box was taken to Chief Michael Walters' office, where it was opened. Inside the box was what looked like a freezer zip-lock-type bag, cut in half. Inside this bag were three smaller bags. Each one of these bags contained smaller one-inch by one-inch packets containing a white, powdery substance. Two bags contained 25 such packets each, and one bag contained 50 packets. The packets of 50 were found to contain cocaine and weighed 14.7 grams. The 25-packet groups each weighed over 10 grams. One group was found to contain cocaine. The other was not tested.

On April 22, 1990, Peoria Detective Kenneth Boddie came to interview defendant in the presence of Smallwood. His main purpose was to check on the gun which was stolen. After acknowledging his *Miranda* rights and waiving them, defendant stated he had no knowledge of the gun. Boddie then asked about the drugs. Defendant explained that while he and the others were in Chicago he received a duffel bag from a friend of his. Defendant took it and placed it in the car. After the car was stopped in Metamora, defendant went to get a coat from the duffel bag. When he did so, he found the drugs. Defendant decided to hide the drugs, and he placed them in the front of his pants. Defendant stated the drugs were not seen by the police until they were found in the box. He never admitted placing them there. Smallwood confirmed this conversation took place.

Defendant testified that they were proceeding from Chicago to Peoria when they were stopped. At the time, he was seated in the back on the passenger side. Slaughter was the driver when they were first stopped. After they were let go, Slaughter and Pollard switched places. They were then stopped again within six or seven blocks. After the police determined Pollard had no license, they asked all the occupants to exit the car and began looking around. The officers looked through the entire car, including under the hood and fenders. When they found the gun, Pullman said it was his. They then arrested all of them. At the scene, defendant was patted down twice.

The defendant, Pullman, and Pollard were placed in a room. No one else was present. Defendant never placed anything in the box in the cabinet. Later, Boddie came to talk with him. Boddie asked where the drugs came from. He then advised defendant he had been told that Raaf took the defendant to the rest room and, when defendant undid his pants, the drugs fell out. When defendant denied this, Boddie then changed his question and stated that when defendant came back from the bathroom he took the drugs out of his pants and put them in the file cabinet. Defendant told Boddie he did no such thing. Defendant admitted telling Boddie he got into the duffel bag for a coat.

Defendant was found guilty. He was sentenced to the mandatory minimum, six years' imprisonment. This appeal followed.

Defendant first alleges his motion to quash his arrest and suppress the evidence should have been granted. He believes the officers lacked probable cause to arrest him for the unlawful-use-of-weapons offense since Pullman admitted the gun was his. He also argues that the Metamora police had no authority to make the second stop of the car because it was outside the city limits and, therefore, their jurisdiction.

Initially it should be noted that defendant acknowledges, assuming *arguendo* that the police were in their lawful jurisdiction, that the police had legitimate grounds to make the second stop to investigate the driving status of the driver. (See *People v. Barnes* (1987), 152 Ill. App. 3d 1004, 505 N.E.2d 427.) Defendant also concedes that the officers directing the occupants to exit the car did not transform the stop into an arrest. Defendant's allegation is that the police did not have probable cause to arrest him for the weapon since Pullman admitted the gun belonged to him.

A police officer may arrest a person without a warrant when he has reasonable grounds to believe that the person is committing or has committed an offense. (Ill. Rev. Stat. 1989, ch. 38, par.

107—2(c); *People v. Davis* (1981), 98 Ill. App. 3d 461, 464, 424 N.E.2d 630, 634.) Reasonable, of course, depends upon the surrounding circumstances of each individual case. (*People v. Peak* (1963), 29 Ill. 2d 343, 347, 194 N.E.2d 322, 325.) Reasonable grounds and probable cause are synonymous for purposes of arrest. (*People v. Wright* (1974), 56 Ill. 2d 523, 528, 309 N.E.2d 537, 540.) Probable cause exists when facts and circumstances within the arresting officer's knowledge are sufficient to justify a man of reasonable caution to believe the defendant committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153.) The probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause exists. (*Tisler*, 103 Ill. 2d at 236, 469 N.E.2d at 152.) However, there must be something more than a mere hunch or suspicion. (*People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 694, 402 N.E.2d 915, 920.) In answering this question, courts are not disposed to be unduly technical, and the determination is to be based on the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. (*People v. Thompson* (1981), 93 Ill. App. 3d 995, 1002, 418 N.E.2d 112, 118.) A reviewing court will not disturb a trial court's finding on a motion to suppress unless that finding is manifestly erroneous. *People v. Waddell* (1989), 190 Ill. App. 3d 914, 923, 546 N.E.2d 1068, 1073.

We have no such difficulty with the present case. It is uncontroverted that a loaded .38 caliber automatic handgun was found lying under the passenger seat in the car. This is clearly a violation of the unlawful-use-of-weapons provisions. (See Ill. Rev. Stat. 1989, ch. 38, par. 24—1(a)(4).) Thus, the sole question is who could be charged for this violation. As long as the weapon is in such proximity to the accused as to lie within easy reach so that the weapon is readily available for use, it is immediately accessible and will sustain a conviction. (See *People v. Smith* (1978), 71 Ill. 2d 95, 101-02, 374 N.E.2d 472, 474.) Here, the evidence establishes that defendant was in the backseat and the gun was found under the front passenger seat. The testimony was contradictory as to where defendant was sitting, but we note defendant maintained he sat directly behind this seat. Regardless of defendant's location, we believe that his ready access to the weapon is clear and his arrest, then, was appropriate.

Defendant maintains since Pullman admitted ownership it does not matter how accessible the gun is to him and Pullman is the only one who should be charged. However, as the trial court observed, the officers are not required to accept Pullman's admission of ownership. We can envision a myriad of situations in which one party will

acknowledge culpability to spare the real guilty party. Law officers should not be precluded by such a statement from proceeding as they think best. Admittedly, if the case went to trial with Pullman admitting ownership and being found to be sitting behind the seat, the State may have difficulty convicting defendant. However, that is not the relevant test. All that is needed is a probability of criminal activity based on the practical considerations of everyday life upon which reasonable men act. Here, this was met.

Defendant next contends the arrest was improper because the officers were outside their jurisdiction at the time of the arrest.

██ █ Under the common law, peace officers generally lacked the authority to make warrantless arrests outside the territorial limits of the political entity by which they were employed, unless they were in hot pursuit of a suspected felon fleeing from their own territory. (*People v. Bains* (1987), 152 Ill. App. 3d 951, 953, 505 N.E.2d 13, 15.) However, the common-law rule has been modified by section 107—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 107—5(c)), which provides an arrest may be made anywhere within the jurisdiction of this State. In construing this provision, one court stated:

> "While there is no case law interpreting the scope of this provision, we believe it lays to rest the notion that a police officer is limited by the concept of territorial boundaries or jurisdiction when making an arrest. Therefore, it is proper for a police officer to make a warrantless arrest in an adjoining county when he has probable cause to believe that the accused committed an offense in the county in which the officer holds office. *This is true even though the officer had merely entered the adjoining county because of some suspicious activity and was not then in fresh pursuit of the offender.*" (Emphasis added.) (*People v. Durham* (1979), 71 Ill. App. 3d 725, 727, 390 N.E.2d 517, 518.)

(See also *People v. Aldridge* (1981), 101 Ill. App. 3d 181, 186, 427 N.E.2d 1001, 1005; *People v. O'Connor* (1988), 167 Ill. App. 3d 42, 45, 520 N.E.2d 1081, 1083; *People v. Carraher* (1990), 199 Ill. App. 3d 965, 969-70, 557 N.E.2d 975, 978-79.) Defendant acknowledges that, based upon the radio dispatch, the officers had justification for stopping the car to investigate if the driver's license was in fact suspended. Since this information gives the officers a reasonable basis for stopping a car to determine if an offense occurred in Metamora it is apparent, pursuant to these authorities, that the stop and ultimate arrest outside the city limits were appropriate.

Defendant next contends he was not proved guilty beyond a reasonable doubt. He first observes the evidence establishes he was subject to pat downs at the scene of the arrest. He believes it defies credibility that he would have 100 packets of cocaine stuck in his pants and the police would not find it. He also maintains the evidence shows that Raaf could not identify what defendant put in the box, and Raaf then left the box in the room with Slaughter. He believes it is possible that she could have put the bags in the box when she was alone. At least it is conceivable, he states, that defendant may have only put in the packets which were not tested and Slaughter put in the bags which ultimately were tested. He believes these points raise a reasonable doubt and his conviction should be reversed.

■■■ A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342, 385 N.E.2d 671, 676.) When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Once the defendant has been found guilty of the charged crime, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.) The relevant question is whether, if after viewing the evidence in such a fashion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277.

■■■ Defendant has raised valid points which counsel effectively made to the jury. The jury, in its fact-weighing process, did not find these factors persuasive and concluded that defendant did commit the offense. It is not for us to retry defendant. There is evidence which shows defendant was wearing multiple layers of clothing, that only one pat down was performed, and that it was done in a very cursory fashion. Further, while the pat down involved the legs, arms, and torso, it appears, and is reasonable, that the officer did not pat down defendant's crotch area where the drugs were kept. As to the box, it is a possibility that Slaughter put items in the box. However, the box was there less than a minute, and the smaller bags were inside the bigger bag. Thus, it would have been necessary for Slaughter to not only place her drugs in the box, but also in the bag which Raaf saw

defendant put there. This is not very likely, and its possibility could reasonably be ignored. Additionally, the jury could have accepted Boddie's testimony as to defendant's statement acknowledging that he possessed the drugs which were found in the box. Considering the evidence pursuant to *Jackson*, we find it sufficient.

Affirmed.

GREEN and KNECHT, JJ., concur.