THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARVEY ALLEN, JR., Defendant-Appellant.
First District (4th Division)   No. 1—88—0189

Opinion filed April 22, 1993.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Harvey Allen, Jr., was convicted of four counts of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1) following a jury trial in the circuit court of Cook County. He was sentenced to natural life in prison without possibility of parole and to a concurrent term of seven years for the arson conviction. Prior to trial on these charges, defendant filed a motion to quash arrest and suppress evidence on the basis that he was arrested without probable cause. On appeal, he contends that (1) the trial court erred in denying his motion to quash arrest and suppress evidence; (2) the trial court erred in finding that his right to counsel was not violated and his confession was voluntary; (3) the State did not establish the voluntariness of his post-arrest statement because it failed to show that he was provided with the rudimentary necessities of life during his detention at the police station; (4) evidence presented by the State was irrelevant and unduly prejudicial, thereby denying him a fair trial; (5) he was denied a fair trial by the introduction of certain hearsay evidence; (6) the trial court erred in denying defense counsel's motion to withdraw; and (7) the mandatory natural life provision, pursuant to the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)), is unconstitutional.

We affirm.

The charges stem from a fire which occurred at approximately 3 a.m. on December 7, 1985, in an apartment building located at 1475 East 70th Street in Chicago. Four people died as a result of the fire. Three of the victims died of carbon monoxide poisoning and the fourth died as a result of carbon monoxide poisoning and injuries suffered when she leaped or jumped from the window of her burning third-floor apartment.

Chicago police patrolman Kenneth Parks arrived on the fire scene shortly after 3 a.m. where he witnessed a victim fall to her death. He immediately began questioning onlookers in an effort to determine if other residents were inside the building. In doing so, he met Sarah Davis, who lived in one of the units with her brother, Sherman Young. Parks testified at trial that Davis was hysterical and screaming when he approached her. According to the witness, Davis told him that earlier that evening she had received several telephone calls from a man named "Julian" who threatened to harm her and her brother. Davis told him she later heard a loud noise, suddenly saw her front door engulfed in flames, and ran out

of the back door. Her brother was not in the apartment at the time of the fire.

Robert Walsh, an officer of fire investigation for the Chicago fire department, testified that he went to the scene shortly after the fire started. He stated that upon entering the front door he smelled gasoline odors in the hallway. After completing his investigation, he determined that the fire was started by pouring and igniting an accelerant on the front door of Young's apartment.

Detective Ernest Rokosik of the bomb and arson unit of the Chicago police department testified that he helped clear debris from Young's apartment. In doing so, he found a charred Black Flag insect can. Rokosik further stated that the can was uncapped and that he clearly smelled the odor of gasoline from the "burn through" hole where the can was found. Rokosik stated that, in his opinion, the fire was deliberately started by someone pouring gasoline on the door of Young's apartment.

Detective James Swistowicz and his partner, Detective George Carey, were assigned to investigate the fire. Swistowicz testified that building residents and other persons on the scene were transported to the third district police station to be interviewed concerning the fire. Among those interviewed at the police station was Sherman Young. Although the record is devoid of any conversation between Young and third district police officers, Detectives Swistowicz and Carey sought to locate a man named Julian, after the beat officers spoke with Young. Upon receiving a description of the building where Julian could be found, the detectives proceeded to the 1200 block of East 72nd Street. Unable to locate the building, they radioed the police station and requested a beat officer to bring Young to their location for further identification of the building. They also requested that Detectives Richard Popovits and Leo Wilcosz meet them.

At approximately 6 a.m. on December 7, 1985, three squad cars arrived at defendant's home. Detectives Swistowicz and Carey approached the front door while Popovits and Wilcosz waited at the back door "just in case someone attempted to run out the back." The beat officer who transported Young to the scene also went to the back, but he remained in an alley. Defendant's father (Harvey Allen, Sr.) answered the officers' knock at the front door. After the officers requested to speak to Julian, defendant's father escorted Detectives Swistowicz and Carey upstairs. He knocked and asked his son to open the door, because police officers wanted to talk to him. Defendant opened the door and identified himself as Harvey Allen,

Jr. In response to the detectives' questions, defendant acknowledged that he knew Sherman Young, but he denied knowing anything about the fire. Swistowicz asked defendant if he would come to the police station to talk further and defendant agreed. Defendant stated he was leaving for Memphis, Tennessee, later that day and wanted to get the matter "straightened out" as quickly as possible. Defendant, who was clothed in pajamas, asked if he could get dressed. Swistowicz answered in the affirmative and followed defendant into the bedroom as a precautionary matter. Meanwhile, Detective Carey let Wilcosz and Popovits into the apartment through the back door.

The four detectives escorted defendant out of the apartment, and Wilcosz and Popovits drove him to the police station. While at the apartment, none of the detectives drew his gun nor was defendant handcuffed. Upon leaving the apartment building, it was discovered that Young had left the area and was no longer in police custody.

Defendant was taken to the Area 3 police station at about 6:20 a.m., where he was placed in an unlocked interview room. Carey and Swistowicz interviewed defendant without advising him of his *Miranda* rights. During this conversation, defendant told them that he called Sherman Young at about 7:30 p.m. on December 6, 1985, and that he left a message with a woman for Young to call him. After questioning other persons, the detectives requested that Sarah Davis and defendant be transported to the Area 1 station, to which they agreed.

Detective Anthony Lowery interviewed Sarah Davis sometime later on the morning of December 7, 1985, and she informed him about the threatening calls from Julian. She said that a person named "Bill" had also threatened her brother and had come to their apartment.

At 9 a.m. at the Area 1 station, Detective Robert Fields advised defendant of his *Miranda* rights, which he said were given to persons under arrest before obtaining a statement from them. Defendant told Fields that on the evening of December 6 he was styling a friend's hair and that Sherman Young came to his apartment to get money to purchase narcotics for him. Defendant stated that when he finished with his customer's hair, he drank some liquor and went to bed. Detective Lowery then asked defendant to take a polygraph test. He was transported to another police station to take the test at 10:30 a.m.

The police technician who administered the polygraph test told police officers that defendant could not be eliminated as a suspect because the test could not be completed. In the technician's opinion, defendant was attempting to distort the test by holding his breath during questioning. Defendant was returned to Area 1 police station at 12:40 p.m. and placed in an interview room.

While defendant was taking the polygraph test, Detectives Swistowicz, Carey and Popovits talked with Yvonne Jones, Young's girl friend. Popovits testified that Jones said Young left her apartment with a friend named Greg Brooks after receiving a telephone call from his sister, Sarah. Young later returned to Jones' apartment with Brooks and told her Julian had given him some money to purchase narcotics but that he was going to use the money to buy drugs for himself and would not pay defendant back. Popovits testified that Jones said she later received a call from Brooks telling her that Julian had burned down Young's apartment because he had "ripped off" Julian.

Defendant was placed under arrest at 2:30 p.m., December 7, by Detectives Lowery and Fields. Lowery stated that from 9 a.m. until the time of the arrest defendant was never informed that he was free to go.

After defendant was placed under arrest, Detective Guy Habiak testified that defendant was taken to the lockup where he remained in an interview room until approximately 8 p.m. Habiak stated that he advised defendant of his rights and requested to see defendant's apartment. Defendant agreed, provided he could go along. After defendant's apartment was searched, he was returned to an interview room at Area 1. Habiak and his partner next spoke to defendant at 7 p.m. on December 8 in an interview room. Habiak stated that the lockup cells were equipped with washrooms and that bologna sandwiches were provided to prisoners.

Detectives Popovits and Carey testified that after defendant was transported to Area 3 on December 7, they did not see him again until 3:30 a.m. on December 9. Detective Swistowicz testified that on December 9 he and Popovits spoke to two gas station attendants who identified defendant from a group of photographs as the person who purchased gasoline in an insect can just prior to the start of the fire. He further testified that they proceeded to Zayre, a department store, where they purchased a can of Black Flag insect spray identical to the one found at the scene of the fire. The witness also stated that he and Popovits returned to the service

station, showed the can to the attendants, and then returned to the police station.

Upon returning to the police station, the detectives provided defendant with some food. Detective Swistowicz testified that this was the first time he had personally provided defendant with food since bringing him to the station on December 7. The record is unclear as to the sequence of events following; however, it appears that after being advised of his rights, defendant repeated his previous statement that he did not threaten Young. The detectives then confronted defendant with an insect can similar to the one that had been found at the scene of the fire. They told defendant that two witnesses at a Shell gas station identified him as purchasing 50 cents worth of gas in an insect can shortly before the fire. The witness testified that defendant was quiet but said he thought he should have an attorney.

Detective Popovits testified that the officers immediately informed defendant that they could no longer speak with him. Popovits also stated he informed defendant that the witnesses who saw him purchase the gasoline could identify his jacket so they needed it for inventory purposes. They took the jacket and moved defendant into a smaller room because they were going to call felony review. Popovits further testified that about five minutes later defendant knocked at the door. Upon the officers' opening the door, defendant told them that he wanted to talk and that he did not mean to hurt "those people." The witness stated that Detective Swistowicz again advised defendant of his rights and defendant then admitted committing the offense. After defendant made his statement, the officers told him to finish his food while they contacted the felony review unit.

Assistant State's Attorney James Kogut testified that, after receiving a telephone call from Detective Popovits, he arrived at the police station at 4 a.m. on December 9, 1985, and was informed of the investigation, but he was not told that defendant had requested counsel. After speaking with defendant alone, Kogut called Detectives Swistowicz and Carey back into the interrogation room and recited the oral statements defendant had made. The witness testified that defendant asked about "a deal" when asked to make a written statement. Upon being informed by Kogut that he had no authority to make a deal, defendant requested an attorney.

Defendant filed a motion to quash arrest and suppress evidence on the basis that he was arrested in his apartment without probable cause. The State argued that defendant was viewed as a source of

information or witness and perhaps a potential witness, but not as an about-to-be-charged suspect.

The trial court took judicial notice that it was 45 hours from the time defendant was brought into the station until he made the alleged statements to Detectives Swistowicz and Carey on the morning of December 9. The trial court ruled the statements were voluntary and the detention of defendant for 45 hours was not illegal or extraordinary as the officers were checking out leads and suspects. The court also ruled that defendant's knock at the door, while detained, was an intervening factor if the request defendant made was for counsel and he made a knowledgeable decision to waive counsel. The trial court also held that, based on the testimony of Habiak, defendant was provided adequate food and washroom facilities.

After the hearing on this motion, defendant filed a supplemental motion alleging that the police did not have probable cause for his arrest at 2:30 p.m. on December 7, 1985. After a hearing, the supplemental motion was denied.

At trial, the State called Gregory Brooks, who testified that he had known Sherman Young for over 15 years and knew him to be a "hustler" and narcotics dealer. He further stated that he knew defendant as the person who also went by the name of Julian Allen or Julian Diamond. Brooks also testified that he knew defendant as a hairdresser and that defendant had styled his hair in exchange for narcotics.

Brooks testified that on the evening of December 6, 1985, he and Young were at Jones' apartment. He stated that defendant called Young at Jones' apartment and that he and Young took a cab to defendant's apartment. The witness further stated that Young went into defendant's apartment and returned with $160 for Young to purchase three grams of heroin for defendant. Brooks testified that they then procured the heroin and returned to Jones' apartment, where they "snorted" one gram of heroin from the bag. Brooks further testified that he left Jones' apartment at about midnight and, upon returning to his home, called defendant to tell him Young was on his way to deliver the narcotics. Brooks stated that defendant called him 30 minutes later, angry that Young had not arrived. Brooks also stated that defendant said he wanted either his narcotics or his money and that he would blow Young's head off if he did not get one or the other. Defendant also told the witness that he had telephoned Young's apartment and that Young's sister lied by telling him that Young was not there. The witness further

stated that at about 4:30 a.m. on December 7, 1985, Young telephoned him and said that defendant had set fire to his apartment.

Howard Borden, a night manager of a gasoline service station located at 7300 Stony Island Avenue, in Chicago, was called as the State's witness. Borden testified that on the night of the fire he and his friend, Rodney Bradford, were alone at the gas station when defendant arrived. He stated that he had known defendant for years and that Bradford recognized him as a neighborhood resident. The witness stated that defendant needed enough gas to fill an empty insect spray can he was carrying because his car had run out of gas. He further stated that he told defendant that he would have to pump the gas himself because it was illegal to sell gas in anything other than a proper container. He further stated that after defendant finished pumping the gas he walked in the direction of the apartment building. The witness also identified the jacket defendant was wearing on the night of the fire and also identified a Black Flag insect spray can as one similar to that brought to the service station by defendant on the night in question.

A keeper of records for the Illinois Bell Telephone Company testified that on the night of December 6, 1985, several telephone calls had been made from the telephone listed in defendant's name to a telephone located in the building where the fire occurred.

After hearing the evidence, the jury found defendant guilty of the murder of four victims and also guilty of arson. At a subsequent sentencing hearing, defendant was sentenced to a term of natural life imprisonment on the four murder convictions and to a concurrent term of seven years' imprisonment for the arson conviction. This appeal followed.

OPINION

The first issue on appeal is whether the trial court erred in finding that defendant voluntarily accompanied police officers to the station for questioning on the morning of December 7, 1985, and that defendant was not subjected to an improper custodial interrogation. Defendant contends that he was placed under arrest when the police came to his apartment on December 7 at 6 a.m. and requested him to accompany them to the police station. Defendant also appeals the trial court's finding that probable cause existed to place him under arrest at approximately 2:30 p.m. on December 7, 1985. Defendant further contends that no probable cause existed when the arrest occurred and that his incriminating statements and any evidence obtained therefrom were tainted by his illegal arrest.

It is well settled that an arrest has occurred when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *People v. Holveck* (1990), 141 Ill. 2d 84, 95; *People v. Graham* (1991), 214 Ill. App. 3d 798.) This court recognized in *Graham* that there are several factors a court may look to in determining whether a reasonable person would believe he was under arrest. "These include the time and place of the confrontation, the number of officers, the presence or absence of family or friends, the presence of conduct normally involved in a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting, and the manner by which the individual is transported to the police station." (*Graham*, 214 Ill. App. 3d at 807.) In addition, our supreme court has considered the following factors: "[W]hether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave [citations]; '[t]he intent of the officer and the understanding of the arrestee' (*People v. Sanders* (1981), 103 Ill. App. 3d 700, 709); and whether the defendant was told he was free to leave or that he was under arrest." (*Holveck*, 141 Ill. 2d at 95.) "A reviewing court will not disturb a ruling on a motion to suppress unless the decision was manifestly erroneous." *People v. Vega* (1990), 203 Ill. App. 3d 33, 41; see *People v. Reynolds* (1983), 94 Ill. 2d 160.

■ Upon review of all the circumstances preceding the conversation with defendant, we find that cumulatively they were such that a reasonable person would have concluded that he was not free to leave.

We believe that when Sherman Young pointed out defendant's apartment to police officers at 6 a.m., they intended to treat defendant as a potential suspect and hold him at the police station until he was formally charged. Two police officers came in the front door while three other officers staked out the back door and a nearby alley. When defendant agreed to accompany the police to the station, one officer watched him dress while the other officer opened the back door so that the remaining police officers could enter defendant's home. When leaving the apartment, defendant was wedged between the four officers and was not given the choice of arranging his own transportation to the station. Once defendant arrived at the police station, he was placed in a windowless interview room, was not permitted to move around freely, was given *Miranda* warnings, and was asked to take a polygraph test.

The State's argument that an arrest did not occur until defendant was formally charged treats various factors in isolation and without regard to the standard of what a reasonable person would have believed in light of all the circumstances. While cases may hold that the absence of one factor or another does not make a police station stay involuntary, here there is a combination of factors which in the total analysis makes it clear an innocent reasonable person would feel he was not free to leave.

The facts of this case are remarkably similar to those in other cases which have held that an arrest occurred at the home. (See *People v. Young* (1991), 206 Ill. App. 3d 789; *People v. Gordon* (1990), 198 Ill. App. 3d 791; *People v. Vega* (1990), 203 Ill. App. 3d 33.) The common scenario is that the police come to the suspect's home to ask questions concerning a crime. After he denies any knowledge, the police request his presence at the police station for additional questioning and he agrees to accompany them. The police then drive him to the police station, where he is placed in a small interview room and is questioned again. Though the suspect continues to deny any knowledge and does not provide any information which would implicate himself in the crime, he remains in the interview room for an extended period of time. At no time is he told he is free to leave, that he may come back to the station at a later time, or that he is under arrest. After repeated questioning, a polygraph examination, and *Miranda* rights have been read, the suspect eventually admits his guilt. Although the defendants in *Young* and *Gordon* agreed to accompany police to the station, the courts held, respectively, that an arrest had occurred at the home, and we are inclined to hold the same in this case. See *Young*, 206 Ill. App. 3d at 800; *Gordon*, 198 Ill. App. 3d at 799.

We find that under the circumstances of this case, a reasonable person would have concluded that he was not free to leave. (See generally *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) We therefore find that the trial court erred in finding no arrest was made at 6 a.m. when defendant was taken from his apartment.

Having found that defendant's arrest was illegal, we must determine whether the incriminating oral statements he made after the arrest should have been suppressed. Defendant contends that the photo identifications made by the gas station attendants were fruits of the illegal arrest and should have also been suppressed. The State argues that both the incriminating oral statements and the photo identifications were admissible because of certain attenu-

ating factors which broke the causal connection between the arrest and the statements. Specifically, the State maintains that probable cause to arrest defendant constituted an intervening circumstance which attenuated the taint of the illegal arrest. Since defendant appeals the trial court's finding that probable cause existed to arrest defendant at 2:30 p.m. on December 7, 1985, we will address that issue first and then address the issue of attenuation.

Probable cause to arrest exists when facts and circumstances within an officer's knowledge are sufficient to lead a reasonable and prudent person to believe the defendant committed the offense. (*People v. Tisler* (1984), 103 Ill. 2d 226, 237; *People v. Thompson* (1991), 215 Ill. App. 3d 514, 519.) The probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause exists. (*Tisler*, 103 Ill. 2d at 236; *Thompson*, 215 Ill. App. 3d at 519.) "[C]ourts are not disposed to be unduly technical, and the determination is to be based on the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act." (*Thompson*, 215 Ill. App. 3d at 519.) The trial court's finding on the issue of probable cause will not be reversed unless it is manifestly erroneous. *People v. Earley* (1991), 212 Ill. App. 3d 457, 465; *People v. Holmes* (1989), 198 Ill. App. 3d 766, 773.

■ Following the hearing on defendant's motion to quash arrest and suppress evidence, the trial court held a supplemental hearing to determine whether probable cause existed to arrest defendant at 2:30 p.m. on December 7, 1985. During the supplemental hearing, we believe that sufficient evidence was presented to uphold the trial court's finding of probable cause and to determine that there were attenuating factors breaking the causal link between the illegal arrest and defendant's statements.

The trial court heard testimony from investigators that the fire was deliberately set at the apartment door in which Sherman Young and his sister, Sarah Davis, lived. In addition, Davis told officers that defendant made several telephone calls to her home threatening to harm her brother if he did not get what he wanted. The police also determined from conversations with Yvonne Jones and Gregory Brooks that defendant attempted to purchase narcotics from Young but that Young used the drugs for himself. Investigators had questioned other persons who might have had reason to harm Young and checked out their stories before defendant was arrested. The record not only indicates that Young, the targeted victim, said defendant was the arsonist but his actions in accompany-

ing police and identifying defendant's residence suggest that Young considered defendant as a suspect. The trial court also heard testimony that defendant held his breath during the polygraph examination and that defendant was preparing to leave town the day after the fire.

Recognizing that polygraph examinations may not be utilized in a determination of probable cause (see *People v. Jones* (1987), 157 Ill. App. 3d 1006), and that it is improper to consider the fact that defendant was leaving town, we find that any weight given to these considerations was harmless error. We believe police officers had probable cause to arrest defendant based on all of the other aforementioned considerations. We therefore find that the trial court did not err in denying defendant's second motion to quash arrest and suppress evidence, which was based on the trial court's finding that the police had probable cause to arrest defendant at 2:30 p.m. on December 7, 1985.

We next address the issue of whether defendant's statements and the photo identification made by gas station attendants should be suppressed. In *People v. Young* (1990), 206 Ill. App. 3d 789, 803, we set forth the standard and factors that are taken into consideration in determining whether to suppress illegally obtained evidence. We stated:

"The fact that an arrest is illegal does not mean that all statements made thereafter are *per se* excludable. [Citation.] The determining question *** is whether defendant's statements were obtained as a result of the exploitation of his illegal arrest or obtained *by means sufficiently distinguishable* to be cleansed of the original taint. In *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, the United States Supreme Court noted that this question 'must be answered on the facts of each case.' [Citation.] As an aid to answering that question, the Court set forth several significant factors, including: (1) the presence of *Miranda* warnings; (2) the temporal proximity of the arrest and the statement; (3) the presence of any intervening circumstances to break the causal connection between the arrest and the statement; and (4) the purpose and flagrancy of the official misconduct." (Emphasis in original.) *Young*, 206 Ill. App. 3d at 803.

■ After reviewing the record, we find that defendant's statements were attenuated from the taint of the illegal arrest. The most important factor in our analysis is the intervening acquisition

of probable cause. (*People v. Pierson* (1988), 166 Ill. App. 3d 558, 564.) "[W]here the police acquire probable cause after an arrest but before a statement is given, 'one could question the wisdom of requiring police to go through the formality of releasing [the defendant], only to rearrest him outside the jailhouse door.' " (*Pierson,* 166 Ill. App. 3d at 564, quoting *People v. Lekas* (1987), 155 Ill. App. 3d 391, 414.) In addition, although police conduct in effectuating the arrest was illegal in this case, it was not particularly flagrant. At the time defendant was apprehended, police knew that the fire was the result of arson. They went to defendant's home after having learned of his threatening telephone calls and after having been led to defendant's home by the targeted victim of the fire. Moreover, defendant made his inculpatory statements several hours after his arrest and after he had repeatedly been read his *Miranda* warnings. After reviewing the record, we believe that the statements made by defendant were obtained by means sufficiently distinguishable to be cleansed of the illegal arrest. *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

■ We also believe that the trial court properly admitted the photograph identification of defendant by Howard Borden and Rodney Bradford as the man who purchased gasoline in an insect can shortly before the fire. Since there is no evidence in the record to suggest that defendant's photo was taken prior to a finding of probable cause to arrest, we cannot find that police acted improperly in using the photograph to obtain a positive identification of defendant from the gas station attendants.

Defendant also contends that his inculpatory statements should have been suppressed because he was denied his fifth amendment right to counsel. After defendant requested counsel, the police requested his jacket to inventory because witnesses at the gas station could identify the jacket. Defendant contends that this request was a tactic designed to elicit a response from him and that it amounted to a continued interrogation in violation of his right to counsel.

When a suspect invokes his right to have counsel present during custodial interrogation, all questioning must cease until counsel has been made available. (*People v. Jackson* (1990), 198 Ill. App. 3d 831, 840, citing *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885.) To demonstrate that defendant has waived his right to counsel after the right has been invoked, the State must show, by a preponderance of the evidence, that the accused initiated the further communication with police. (*Jackson,* 198 Ill. App. 3d at 840; *People v. Mackey* (1990), 207 Ill.

App. 3d 839, 858.) Whether a defendant voluntarily initiates a later statement is determined by examining the totality of the circumstances, and the trial court's finding on this issue will not be reversed unless it is manifestly erroneous. *People v. Gray* (1991), 212 Ill. App. 3d 613, 616.

We find the trial court's ruling that police officers honored defendant's right to counsel and that defendant voluntarily initiated conversation with police officers was not manifestly erroneous. When defendant requested an attorney, police officers immediately stopped the interrogation. The officers requested defendant's jacket and then left the room. Approximately 10 minutes later, defendant knocked on the door and reinitiated conversation with the officers. After being advised of his rights, defendant made the first of his two oral confessions. We do not believe that the police request for defendant's jacket resulted in a continuing interrogation under the totality of the circumstances test. Nor do we believe that the detectives' conduct amounted to a psychological tactic designed to elicit a response from defendant.

We therefore find that the trial court did not err in finding that defendant's confession was voluntary.

Relatedly, defendant asserts that his post-arrest statement was involuntary because he was denied food, the opportunity to sleep, and access to washroom facilities. We disagree.

The evidence demonstrates that defendant was held in a lockup cell and in an interview room for the duration of his detention at the police station. The lockup facilities contained washrooms in addition to long benches on which defendant could have slept. Sandwiches were also provided for individuals held in lockup. Defendant never complained about his lack of sleep, lack of food, or about the availability of washroom facilities. Detective Swistowicz testified that he took defendant to the washroom three times. He also stated that he saw defendant sleeping in one of the interview rooms on several occasions. Detective Popovits testified that he brought defendant a cheeseburger and a soda shortly before he confessed. Also during his detention, an assistant State's Attorney asked defendant about the quality of his treatment and he voiced no complaint.

We believe, contrary to his contentions, that defendant had ample access to the rudimentary necessities of life while in police custody and we do not believe his confession was coercive in nature. "Findings by the circuit court on the question of voluntariness of a confession will not be disturbed by a court of review un-

less they are against the manifest weight of the evidence." (*People v. Redd* (1990), 135 Ill. 2d 252, 292-93; see *People v. Jones* (1990), 196 Ill. App. 3d 937.) In view of the totality of the circumstances, we perceive no error in the trial court's finding that defendant's confession was voluntary.

Next, defendant contends that he was denied a fair trial by the introduction of irrelevant and prejudicial evidence. First, defendant asserts that the State deliberately elicited extensive testimony from four firemen describing how they fought the fire and attempted to rescue trapped victims merely to arouse sympathy for the firemen. Defendant also contends that testimony by surviving fire victims who described their escape from the fire was designed to focus on the victims' pain and suffering. Defendant contends that the matters presented by the State were irrelevant and were presented in a manner to lead the jurors to believe that they were material and relevant.

Generally, evidence which tends to prove or disprove a disputed fact or to render a matter at issue more or less probable is relevant and should be admitted. (*People v. McGee* (1991), 211 Ill. App. 3d 641, 650.) "The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." *People v. Ward* (1984), 101 Ill. 2d 443, 455-56.

■ In this case, defendant was charged with arson and murder and the State's burden of establishing defendant's guilt was proof beyond a reasonable doubt. Testimony by firefighters and surviving victims as to the extent of the fire was clearly relevant to proving elements of the offenses charged. The State's proof of the nature and extent of the arson could not be limited simply because defendant did not contest the fire was an arson. Similarly, although defendant did not contest the fact that four victims died in the fire, the State was nevertheless permitted to present evidence on how the victims died. Although the witnesses' testimony was prejudicial, we believe that its probative value was not outweighed by its prejudicial effect. We therefore find that the trial court did not abuse its discretion in permitting the State to question its witnesses in detail about the fire.

Defendant also contends that the trial court abused its discretion when it permitted eight blown-up photographs of the deceased victims into the jury's deliberations.

Our supreme court has held that "photographs of a decedent which are relevant to establish any issue of fact are admissible in

spite of the fact that they may be gruesome or inflammatory [citations], and that it is not an abuse of discretion to allow the jury to consider. photographs which may be characterized as 'disgusting' [citations]." (*People v. Simms* (1991), 143 Ill. 2d 154, 177.) The court also held that " '[t]he major bulwark against prejudicing the jury is the sound discretion of the trial judge.' " *Simms*, 143 Ill. 2d at 177, quoting *People v. Foster* (1979), 76 Ill. 2d 365, 378.

■ As we previously stated, the State was permitted to present evidence on how the victims died. Although the photographs were gruesome and disgusting, we cannot find that the trial court abused its discretion in admitting the photographs into the jury's deliberations.

Next, defendant contends that the trial court erred in admitting hearsay evidence by Gregory Brooks that Young told him defendant had burned his apartment. The State argues that defendant failed to raise an objection to Brooks' testimony during the trial and, therefore, he has waived his right to appellate review.

It is well recognized that alleged trial errors not objected to at trial or preserved in a post-trial motion are waived on appellate review. (*People v. Enoch* (1988), 122 Ill. 2d 176, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 176, 109 S. Ct. 274.) Only if the evidence is closely balanced or if the error is of such magnitude that defendant was denied a fair trial will a reviewing court consider the error under the plain error doctrine. (*People v. Nitz* (1991), 143 Ill. 2d 82, 108.) In addition, "hearsay evidence admitted without objection is properly considered by the court and is to be given its natural probative effect." *People v. Darnell* (1990), 214 Ill. App. 3d 345, 360.

■ We find that the plain error rule does not apply in this case, because the evidence is not closely balanced nor is the alleged error of such magnitude that defendant was denied a fair trial. The evidence supporting defendant's conviction in this case was overwhelming, notwithstanding the admission of Brooks' alleged hearsay testimony. Because defendant failed to object to Brooks' alleged hearsay testimony at trial or in any of his post-trial motions, the issue is waived.

Defendant also contends that hearsay testimony by Kenneth Parks that Sarah Davis told him about threatening calls from defendant was improperly admitted and resulted in reversible error. The State argues that Officer Parks' testimony was properly admitted under the excited utterance exception of the hearsay rule. The

trial judge found that the statements were admissible under the excited utterance exception of the hearsay rule.

"It is undisputed that there are three factors to be considered when determining the admissibility of a statement under the spontaneous declaration exception: (1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflected statement, (2) absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence." *People v. Hart* (1991), 214 Ill. App. 3d 512, 521; *In re L.S.* (1989), 190 Ill. App. 3d 1031, 1034.

■■ At the time Officer Parks encountered Davis, she was crying and screaming hysterically. She had just witnessed an explosion at the front door of her apartment and had to run for safety. In addition, she had just witnessed a neighboring tenant fall to her death while their home was being destroyed by the fire. We believe that these conditions satisfied the requirements to admit Davis' comments under the excited utterance exception of the hearsay rule.

We therefore find that the trial judge did not abuse his discretion when he admitted Officer Parks' testimony that Sarah Davis told him about the threatening calls from defendant under the spontaneous declaration exception.

Next, defendant contends that the trial court erred in denying defense counsel's motion to withdraw as counsel due to a conflict of interest. After the trial, defendant filed a *pro se* motion for a new trial alleging inadequacy of counsel in failing to call certain witnesses during the post-trial hearings. During the hearing on this motion, defense counsel moved to withdraw as counsel because defendant filed a civil suit against him. The court found defendant's civil claim to be without merit and denied the motion to withdraw as counsel. Defendant contends that since his attorney was laboring under a conflict of interest due to his allegations, the trial court erred in not permitting counsel to withdraw.

"Inherent in a trial judge's authority to conduct and preside over a criminal trial is the discretion to conclude that a defendant's conduct or pursuit of an otherwise legal right is frivolous and merely an attempt to frustrate the administration of justice." (*People v. Hardeman* (1990), 203 Ill. App. 3d 482, 490.) The trial court's discretion in such cases is subject to review, but "the trial judge must be assured that he is not hamstrung and that he may exercise the discretion." (*Hardeman*, 203 Ill. App. 3d at 491.) In addition, "the trial court should examine the factual matters underlying the defendant's claim, and, if the claim lacks merit or pertains to mat-

ters of trial strategy, then no new counsel need be appointed." (*People v. Reed* (1990), 197 Ill. App. 3d 610, 612.) "Only if the allegations show possible neglect of the case for which counsel could undertake an independent evaluation of defendant's complaint and present the matter to the court should new counsel be appointed." *Reed*, 197 Ill. App. 3d at 612.

■■■ Upon review of the record, we do not find that the trial court abused its discretion in finding that defendant's civil claim was without merit. In addition, the record does not demonstrate that the outcome in this case would have been different had defense counsel's motion been granted. Defendant's allegations were primarily concerned with defense counsel's failure to call certain witnesses which is clearly a matter of trial strategy and tactics. (See *People v. Allen* (1989), 184 Ill. App. 3d 438, 452.) We therefore hold that the trial court did not err in denying defense counsel's motion to withdraw as counsel due to a conflict of interest.

Lastly, defendant contends that the mandatory natural life provision of the statute (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)) violates due process and is therefore unconstitutional.

■■■ Defendant's contention that section 5—8—1(a)(1) is unconstitutional because it violates due process has been rejected by this court. (See *People v. Rivera* (1988), 176 Ill. App. 3d 781, 791; *People v. Bailey* (1987), 164 Ill. App. 3d 555, 579.) We therefore find defendant's contention challenging the constitutionality of section 5—8—1(a)(1) without merit.

For the foregoing reasons, we affirm the ruling of the circuit court.

Affirmed.

JIGANTI, P.J., and CAHILL, J., concur.