**James J. CERVANTES, Plaintiff–Appellant,**

v.

**Larry JONES, Defendant–Appellee.**

**No. 98–3828.**

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1999.

Decided Aug. 13, 1999.

Kenneth N. Flaxman (argued), Chicago, IL, for Plaintiff–Appellant.

Bruce L. Carmen (argued), Steven M. Puiszis, Hinshaw & Culbertson, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

Officer Larry Jones testified before an Illinois grand jury about evidence linking James Cervantes to the brutal murder of Cervantes' sometimes girlfriend, Sally Lavergne. After hearing the prosecutor's evidence, including Jones' testimony, the grand jury indicted Cervantes for first degree murder. Pending trial, Cervantes remained incarcerated for almost three years. A jury later acquitted him of the murder. Subsequently, Cervantes sued Jones under 42 U.S.C. § 1983 and Illinois law, alleging that Jones violated Cervantes' rights under the Fourth Amendment and Illinois law by testifying falsely before the grand jury. The district court granted summary judgment for Jones, from which Cervantes appeals. We affirm.

## I.

On July 20, 1992, a neighbor discovered the dead body of Sally Lavergne in Lavergne's apartment in South Elgin, Illinois. Lavergne's death resulted from multiple stab wounds from a butcher's knife in her chest and abdomen, although she also suffered severe skull fractures from a beating with a glass ashtray. There were no signs of forced entry, and the assailant fled without leaving any fingerprints. Cervantes became a suspect early in the investigation, as he was one of Lavergne's few

friends. Elgin Deputy Chief of Police Larry Jones first interviewed Cervantes on July 20, and again with another officer present on July 25. Late at night on December 8, 1992, after discussing the murder with Cervantes at his apartment, Jones and two other officers took Cervantes to the police station for a polygraph examination. The examination indicated that Cervantes was untruthful when he denied killing Lavergne.

At approximately 5:00 a.m. on December 9, after the police finished questioning Cervantes, Jones drove him home. During the ride, Cervantes and Jones carried on a conversation in which Jones mentioned to Cervantes that it seemed he wanted to come clean. Cervantes' response to this statement is disputed, so we accept his version in the posture of this case. According to Cervantes, he responded: "If I confess to a crime that I did not commit, what would my defense be? I've got too much to lose." Jones tells a slightly different story, but the differences are important. Jones testified to the grand jury that Cervantes' response was: "Yes I would like to do that [confess to the crime]. But I've got too much to lose. If I admit I killed Sally, what would my defense be?" Cervantes contends that Jones also lied to the grand jury by telling it that Cervantes admitted to lying about whether he was at his mother's house on the day of the murder,[1] that he has difficulty controlling his temper when he drinks, and that he had been drinking and smoking marijuana on the night of the murder.

1. Both we and the parties are being imprecise in referring to the "day of the murder," or the "night of the murder." The police estimate that the murder occurred sometime between 9:45 p.m. on July 19, and 6:30 a.m. on July 20, 1992.

2. In *Albright v. Oliver*, the Supreme Court held that an action for malicious prosecution cannot be based on substantive due process, but declined to decide whether the Fourth Amendment could serve as the basis for such suits. 510 U.S. 266, 275, 114 S.Ct. 807, 127

After hearing the prosecutor's evidence, including Jones' version of events, the grand jury indicted Cervantes for Lavergne's murder. He was arrested and held in custody for almost three years while awaiting his trial for capital murder. On March 7, 1996, he was released from custody when a jury acquitted him. Cervantes sued under Illinois law and 42 U.S.C. § 1983, alleging that Jones violated his Fourth Amendment and Illinois common law rights by maliciously prosecuting him. Jones moved for summary judgment, arguing, among other things, that probable cause existed for the prosecution and that he enjoyed absolute immunity. The district court granted summary judgment for Jones, holding that Jones did not initiate or continue the prosecution of Cervantes, and that Jones was therefore entitled to absolute immunity. *Cervantes v. Jones*, 23 F.Supp.2d 885, 890, 892 (N.D.Ill. 1998). Cervantes appeals, and we review the grant of summary judgment *de novo*. *DiGiore v. Ryan*, 172 F.3d 454, 459 (7th Cir.1999).

**II.**

Section 1983 establishes a cause of action for persons deprived of constitutional rights by government officials acting under color of state law. 42 U.S.C. § 1983. Where a criminal defendant is prosecuted without reasonable grounds and was unlawfully incarcerated before his trial, he may bring an action for malicious prosecution under § 1983, ostensibly for a violation of his Fourth Amendment rights. *Smart v. Board of Trustees of the Univ. of Ill.*, 34 F.3d 432, 434 (7th Cir.1994).[2]

L.Ed.2d 114 (1994). As some judges have recognized, "the tort of malicious prosecution fits uneasily within the Fourth Amendment. That amendment proscribes unreasonable searches and seizures and has been held to prohibit arbitrary law-enforcement actions up until the time of arraignment. To justify a Fourth Amendment malicious prosecution claim, then, one has to extend the period of 'seizure' past arraignment." *Kerr v. Lyford*, 171 F.3d 330, 343 (5th Cir.1999) (Jones, J., concurring); *see Wilkins v. May*, 872 F.2d

■ To withstand summary judgment, a plaintiff alleging malicious prosecution under § 1983 must create a genuine issue of material fact as to each element of this constitutional tort. That is, he must provide some evidence that: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty. *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir.1998); *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir.1996). Under Illinois law, the tort of malicious prosecution requires a showing that: (1) the plaintiff was subject to judicial proceedings; (2) for which there was no probable cause; (3) the defendant instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury. *Rybicki*, 146 F.3d at 480–81; *Reed*, 77 F.3d at 1051.

■ The district court granted summary judgment based on the "instituted or continued the proceedings maliciously" element and absolute immunity, which as we shall see, involve essentially the same question. Although the text of § 1983 does not admit of any immunities to suits brought under this section, the Supreme Court has held that these suits are subject to the immunities available at common law, so long as they are not in conflict with the purposes of § 1983. *Burns v. Reed*, 500 U.S. 478, 484, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *Malley v. Briggs*, 475 U.S. 335, 339–40, 106 S.Ct. 1092, 89 L.Ed.2d 271

(1986). Accordingly, in order to protect prosecutors from vindictive lawsuits which might directly or indirectly impede their roles as public servants, prosecutors enjoy absolute immunity for activities which are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Similarly, to prevent the harassment of witnesses and to promote unrestrained testimony in criminal cases, the Supreme Court held that witnesses at trials are absolutely immune from suits under § 1983 for providing false testimony at trials. *Briscoe v. LaHue*, 460 U.S. 325, 334, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see Jurgensen v. Haslinger*, 295 Ill.App.3d 139, 229 Ill.Dec. 574, 692 N.E.2d 347, 349 (1998) (Illinois law). For the same reasons, this immunity extends to witnesses who commit perjury in pretrial proceedings. *Curtis v. Bembenek*, 48 F.3d 281, 285 (7th Cir.1995) (police officer entitled to immunity for providing perjurious testimony in probable cause and suppression hearings).[3] Thus, a witness is absolutely immune from suits based on testimony given before a grand jury. *Jones v. Cannon*, 174 F.3d 1271, 1286 (11th Cir. 1999); *Kincaid v. Eberle*, 712 F.2d 1023, 1024 (7th Cir.1983) (per curiam).

■ An exception to this wall of immunity for trial and pretrial testimony exists for a "complaining witness." Complaining witnesses were not absolutely immune from malicious prosecution suits at common law.[4] *Malley*, 475 U.S. at

190, 194 (7th Cir.1989) (rejecting the concept of a continuing seizure). For present purposes, however, we assume that Cervantes had a right under the Fourth Amendment to be free from malicious prosecution.

3. Again, immunity is extended to these witnesses because "a witness who knows he may be subjected to costly and time-consuming civil litigation for offering testimony that he is unable to substantiate may consciously or otherwise shade his testimony in such a way as to limit potential liability." *Curtis*, 48 F.3d at 285 (citation and internal quotations omitted).

4. The common law distinguished defamation actions from suits for malicious prosecution. All witnesses had immunity from defamation actions for testimony given in court, but complaining witnesses were still subject to lawsuits for malicious prosecution. *Enlow v. Tishomingo County, Miss.*, 962 F.2d 501, 511 (5th Cir.1992); *see Burns*, 500 U.S. at 501, 111 S.Ct. 1934 (Scalia, J., concurring and dissenting). In a defamation action, the plaintiff seeks to hold the perjurious witness liable for the defamatory effects of his testimony; in a malicious prosecution claim, the plaintiff's complaint centers on the witness'

340, 106 S.Ct. 1092; *Harris v. Roderick*, 126 F.3d 1189, 1199 (9th Cir.1997). "The common law made a subtle but crucial distinction between two categories of witnesses with respect to their immunity for false testimony. Those whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution—complaining witnesses—did not enjoy immunity." *White v. Frank*, 855 F.2d 956, 958–59 (2d Cir. 1988). To qualify as a complaining witness (and thereby be disqualified from absolute immunity), a witness must play a sufficient role in initiating the prosecution.[5] *Id.* at 962. Of course, merely providing false testimony to a grand jury is not enough. *Id.* at 961. Rather, as we stated in *Curtis*, a complaining witness is one " 'who actively instigated or encouraged the prosecution of the plaintiff.' " 48 F.3d at .286 (quoting *Anthony*, 955 F.2d at 1399 n. 2); *see Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir.1997) (no immunity for a "complaining witness who set the wheels of government in motion by instigating a legal action"); *Enlow*, 962 F.2d at 511 (a complaining witness is one who actively instigated, encouraged, or perpetrated the prosecution). Thus, the term "complaining witness" is something of a misnomer, as the complainant need not testify as a witness so long as he played a significant role in initiating or procuring the prosecution. *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 512, 139 L.Ed.2d 471 (1997) (Scalia, J., concurring).

As we mentioned above, the district court found that Jones was not an initiator of the prosecution, and thus Cervantes failed to establish an essential element of his Illinois and federal claim and Jones was entitled to absolute immunity. 23 F.Supp.2d at 890. Indeed, the record showed that while Jones was the one who suggested that the Kane County State's Attorney's Office obtain blood and hair samples from Cervantes, he never exhorted prosecutors to seek an indictment of Cervantes—at least not in so many words. According to the affidavit of the State's Attorney, John Barsanti, he (Barsanti) made the decision to prosecute Cervantes. But we note that Jones was the only witness to testify before the grand jury, and during that testimony he made allegedly false statements indicating that Cervantes essentially confessed to the murder. Jones also appeared to be the lead investigator and the police official who kept the investigation going. *See White*, 855 F.2d at 957, 962 (police officers may be complaining witnesses due to their testimony before a grand jury despite the fact that the prosecutor also played a significant role in advancing the prosecution); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir.1988) ("the jury could find that the defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision to prosecute"). After considering these and other facts (which we construe in the light most favorable to Cervantes), we think that Jones' role as the instigator of Cervantes' prosecution is a closer question than the district court suggested. As we said in *Jones*, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." 856 F.2d at 994. Thus, because we may affirm a summary judgment on any ground for which there is adequate support in the record, we turn instead to the easier question of whether probable cause existed. *See EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 746 (7th Cir.1998).

The existence of probable cause for the prosecution is a complete

---

role in initiating a meritless prosecution. *Enlow*, 962 F.2d at 511 n. 29.

5. A witness' status as a complaining witness is a question of fact. *Anthony v. Baker*, 955 F.2d 1395, 1399 (10th Cir.1992).

defense to an action for malicious prosecution under both Illinois and federal law. *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir.1989); *Burghardt v. Remiyac*, 207 Ill.App.3d 402, 152 Ill.Dec. 367, 565 N.E.2d 1049, 1052 (1991).[6] The determination of probable cause is a mixed question of law and fact.[7] *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir.1998). But when facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1112 (7th Cir. 1997); *People v. Cooke*, 299 Ill.App.3d 273, 233 Ill.Dec. 676, 701 N.E.2d 526, 529 (1998). Of course, a dispute concerning some facts relevant to the probable cause analysis does not preclude a finding of probable cause so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record. *Kerr*, 171 F.3d at 340 n. 13; *Wolter v. Safeway Stores*, 153 F.2d 641, 642 (D.C.Cir.1946). Probable cause means "the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Kerr*, 171 F.3d at 340 (footnote and internal quotations omitted); *see Frye v. O'Neill*, 166 Ill.App.3d 963, 117 Ill.Dec. 882, 520 N.E.2d 1233,1241 (1988); *Kincaid v. Ames Dep't Stores, Inc.*, 283 Ill.App.3d 555, 219 Ill.Dec. 215, 670 N.E.2d 1103, 1109 (1996). This analysis is based on " 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Humphrey*, 148 F.3d at 726 (quoting *Brinegar v. United States*, 338 U.S. 160,

175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Importantly, the official's subjective belief as to the legal basis of the prosecution is irrelevant; the test for probable cause is an objective one. *Graham v. Connor*, 490 U.S. 386, 398, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances. . . ."); *Potts*, 121 F.3d at 1113; *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir.1994).

In February 1993, the FBI's National Center for the Analysis of Violent Crime prepared a profile of Lavergne's killer based on the evidence gathered from the murder scene, the assailant's modus operandi, and common sense. While this isn't summary judgement evidence itself, it shows how a reasonable person might interpret the facts which were available to Jones. Using their experience with prior violent crimes, the FBI depicted the probable assailant in terms that are strikingly descriptive of Cervantes. The report described the probable assailant as having low socio-economic status, being at least thirty years of age, an alcohol or drug abuser, and someone who has a history of abusing those weaker than he, such as women or children. The FBI report also concluded (as a reasonable person could) that:

> \* The nature of the wounds, use of multiple weapons, and the knife being left in the victim, suggest personalized anger and is normally generated from someone who has an anger towards the victim for a longer period of time than the day of this murder. The offender came to the victim's apartment angry; however, because he used weapons of opportunity he may not have planned to

---

**6.** The district court did not reach the issue of whether probable cause existed, but relied instead on the grounds mentioned above.

**7.** A grand jury indictment is usually prima facie evidence of probable cause. *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir.1994). But in construing the facts in the light most favorable to Cervantes, his allegation that the

indictment was the product of Jones' perjury precludes us from considering the indictment in our probable cause analysis. A contrary rule could allow an indictment procured by lies to protect a witness from liability for his perjury. *See Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir.1997).

go there to kill her. However, once at the victim's apartment, interaction between the victim and the offender escalated to murder.

\* Because the offender took time to conduct some cleanup after the murder, it is likely he was familiar with the apartment, and had a higher degree of comfort in the apartment than might be expected from a stranger.

[FBI Rept. pp 2–3]

Cervantes' correlation with the profile started with his age, as Cervantes was in his early thirties. With respect to his socio-economic status, Cervantes was not affluent, as he was earning $9 per hour at the time he was arrested. There was no sign of a forced entry, which was consistent with the theory that the assailant was (like Cervantes) known to Lavergne or (again like Cervantes) had keys to Lavergne's apartment. Moreover, Cervantes' relationship with the victim was not a fleeting one, as they occasionally had sexual relations—despite the fact that Cervantes was married to another woman, Theresa Cervantes. Police interviews with Lavergne's co-workers, family, and friends revealed that the victim was often seen with a man who appeared to be Hispanic, and that Lavergne would let this man use her apartment, would give him rides to work, and may have loaned him money. Lavergne's neighbor—Lillian Peyton—told police that the Hispanic man's name was "James," and confirmed that James had a key to Lavergne's apartment.

With respect to the FBI's reasoning that the assailant was known to be violent and had festering anger towards the victim, a friend who lived with Lavergne during the summer of 1991—Arlene Miller—informed Jones that Lavergne had complained that Cervantes had beaten her, and showed bruises from the beatings on her head, face, and arms. These beatings were also in accordance with the FBI's inference that the assailant had a history of abuse toward weaker people. Cervantes' violent nature was further confirmed by Sandra

Skoty—Cervantes' former housemate and mother of his child—who told the police that Cervantes had difficulty controlling his temper when he drank alcohol, and that on one occasion when she was pregnant, Cervantes struck her. Theresa Cervantes and Penny Newman (Cervantes' girlfriend and housemate at the time of the murder) also told the police that Cervantes had struck them when he had been drinking, and Theresa Cervantes has a scar on her lip to prove it.

█ Cervantes was also a known alcoholic, consistent with the FBI's projection that the killer was an alcohol or drug abuser. Furthermore, Newman confirmed what the other women in Cervantes' life said: he was especially violent after drinking alcohol. Beyond Cervantes' correlation with the FBI's profile, numerous other facts cast suspicion on Cervantes. Marilene Gable—a friend of Penny Newman—told police that Newman told her on the night of Lavergne's murder that Newman and Cervantes were going over to James's friend Sally's house that evening. After the murder occurred, Newman told Gable that Lavergne was indeed the woman she and James had intended to visit that night, but that they never made the trip to Lavergne's apartment. Newman gave no reason for the sudden change of plans, other than that Cervantes was tired. As to particularized anger towards Lavergne, the owner of a restaurant that Lavergne frequented—Marguerite Lombardo—told police that Lavergne and an Hispanic man had been at the restaurant a few days prior to the murder, and after the Hispanic man left Lavergne confided to her that the man was "mad" at her because she told him that he could no longer use her apartment. Furthermore, Cervantes admits that he met Lavergne at the restaurant around that time in order to invite her to dinner while his girlfriend was away. Additionally, Cervantes had an opportunity to commit the crime. Newman told police that she was not sure what time she went to bed the night of the murder and acknowledged that Cervantes

might have left the house after she went to sleep, thus negating Cervantes' alibi. Also, a polygraph examination indicated that Cervantes was not being truthful when he denied killing Lavergne.[8] Similarly, Newman's polygraph results suggested that she was untruthful when she denied involvement in the murder or knowledge of who was involved.[9] Finally, another part of Cervantes' alibi—that he was at his mother's house sometime during the day of the murder—could not be corroborated. Furthermore, it might seem strange to a reasonable person that Cervantes picked that day to visit his mother, as his mother told police that she hadn't seen him in some time and didn't even know where he lived.[10]

Because probable cause is based on the totality of the circumstances, exculpatory evidence is also relevant. Although Lavergne's blood was found throughout the apartment, no analyzable fingerprints were found. But this by no means eliminates probable cause for suspecting Cervantes. Rather, using the rationale employed by the FBI report, the wiping away of fingerprints enhances the suspicion that the assailant was someone like Cervantes, who was familiar with the apartment, knew that nobody was likely to disturb him, and thus was comfortable taking his time to erase any traces of his presence.

■ More favorable to Cervantes was Lavergne's previous promiscuity and the

---

**8.** After a suppression hearing (not at issue here) before Kane County Circuit Court Judge James Doyle, Judge Doyle determined that the FBI agent who conducted Cervantes' polygraph examination committed perjury. Specifically, Agent Michael Hanna lied under oath at the suppression hearing when he told Judge Doyle that he was admitted to the Iowa bar. This fact was relevant to the suppression hearing because around the time of the polygraph examination, Cervantes suggested to Hanna that he might like to speak to a lawyer. In an effort to discourage this, Hanna told Cervantes that anything Cervantes wanted to discuss with a lawyer he could address to Hanna, as he was a lawyer. Of course, we find it disheartening, to say the least, that a federal agent would use lies in an attempt to convict a defendant in a capital murder case. But although Cervantes contends that Hanna's penchant for dishonesty tainted the polygraph results, our first analysis of probable cause is based on the information available at the time the prosecution was instituted. At that time, nobody had any reason to suspect that Hanna was dishonest. Regardless, probable cause to prosecute Cervantes existed even without the polygraph evidence.

**9.** Cervantes argues that polygraph evidence cannot be considered in determining whether probable cause existed for prosecuting him. It is true that due to the suspected unreliability of polygraphs, Illinois courts have created a rule that the police, grand juries, and courts may not rely on polygraph evidence in determining whether probable cause exists. *People v. Allen*, 249 Ill.App.3d 1001, 189 Ill.Dec. 788, 620 N.E.2d 1105, 1114 (1993); *People v. McClellan*, 232 Ill.App.3d 990, 175 Ill.Dec.

476, 600 N.E.2d 407, 416 (1992). But as a matter of federal law, polygraph results are one of many factors which may be used in determining whether, from an objective viewpoint, probable cause for an arrest existed under the Fourth Amendment. *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir.1996) (relying on polygraph results as one factor in finding that Illinois police officers had probable cause for an arrest as a matter of law); *see Kerr*, 171 F.3d at 341 (relying on polygraph evidence in determining that probable cause existed); *Herb Hallman Chevrolet v. Nash-Holmes*, 169 F.3d 636, 643 (9th Cir.1999) (same); *Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir.1997) (indications of deceptiveness from polygraph may be one factor considered in probable cause analysis); *Johnson v. Schneiderheinz*, 102 F.3d 340, 342 (8th Cir.1996) ("the negative polygraph exam results were not the only undisputed facts upon which probable cause could rest"); *Marx v. Gumbinner*, 905 F.2d 1503, 1506, 1507 (11th Cir.1990); *Bennett v. City of Grand Prairie, Tex.*, 883 F.2d 400, 405–06 (5th Cir.1989) (polygraph results, in conjunction with other evidence, may be used in determining whether probable cause exists to issue warrant). Therefore, this argument is without merit. Furthermore, as we mentioned above, the polygraph evidence was not essential to establishing probable cause.

**10.** Cervantes argues that his mother certainly knew where he lived. But her actual knowledge is irrelevant; the question is what did she tell the police, and Cervantes offers no evidence that his mother did not make this statement to the police.

fact that she once allowed another man to stay overnight in her apartment, thus raising the possibility that someone else committed the crime. Cervantes suggests that this possibility gets some support from the DNA which was extracted from blood found on a towel in Lavergne's bathroom, as it belonged to neither the victim nor Cervantes. Also in Cervantes' favor, there were no eyewitnesses or physical evidence linking Cervantes to the crime. At the same time, there were no eyewitnesses linking anyone else to the crime. Finally, there were Cervantes' own self-serving denials—the value of which was diminished by the polygraph results—and his uncorroborated alibi that he was at home the night of the murder. Perhaps some or all of these tidbits ultimately caused the jury not to find guilt beyond a reasonable doubt. But preliminarily, at least, most of the evidence pointed to Cervantes. He, after all, was the only man known to have had keys to Lavergne's apartment, and he still had one key after the murder. Also, he was the only man Lavergne ever mentioned to her sister Diane. In short, the totality of the facts in the record and the inferences derived from them would lead a reasonable person to the strong suspicion that Cervantes murdered Lavergne. Therefore, even without Jones' disputed testimony, probable cause existed to prosecute Cervantes for this crime. *Cf. Meehan v. Town of Plymouth*, 167 F.3d 85, 91 (1st Cir.1999) (describing the circumstantial evidence that led to a finding of probable cause). Because the prosecution was supported by probable cause as a matter of law, Jones has a complete defense to the malicious prosecution suit, and Cervantes is unable to establish an essential element of his Illinois law claim and his § 1983 claim based on the Fourth Amendment.[11] Therefore, the district court correctly granted summary judgment.[12]

AFFIRMED.

11. Cervantes also complains that he was not given time to depose Jones and the prosecuting attorney, John Barsanti. In responding to Jones' motion for summary judgment, Cervantes argued to the district court that Barsanti's affidavit was irrelevant, but argued in the alternative that if it were relevant, ruling on the motion should be continued pursuant to Fed.R.Civ.P. 56(f), so that Cervantes could depose Jones and Barsanti. The district court did not abuse its discretion in addressing the summary judgment motion without granting Cervantes additional time for depositions. First, a request for additional time which is conditioned on whether the district court thinks a deposition would be fruitful is not a proper request for a continuance, as it requires the district judge to act as the plaintiff's agent and to advise him on what discovery he should pursue. Also, Cervantes' excuse for failing to depose Barsanti before the motion for summary judgment—that he refrained from taking depositions in order to foster an atmosphere conducive to settlement—is insufficient and borders on the foolish. *See Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir.1996) (to obtain a continuance under Fed.R.Civ.P. 56(f) a party must (1) request a continuance, and (2) provide a sufficient reason for requesting the continuance).

12. Because we affirm the summary judgment, Jones' motion to strike Cervantes' reply brief is moot.