**Raymond NUGENT, Plaintiff,**

v.

**Edward HAYES, Patrick O'Neil, Coroner of Will County, Illinois, Brendan Ward, Sheriff of Will County, and Will County, Illinois, Defendant.**

No. 99 C 1372.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 14, 2000.

---

Anthony Pinelli, Attorney at Law, Thomas M. Breen, Martin, Breen & Merrick, Chicago, IL, for Plaintiff.

Gerald Haberkorn, Lowis & Gellen, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

On August 6, 1996, Cheryl Nugent, wife of the plaintiff Raymond Nugent, died as a result of injuries sustained from a gunshot wound. Mr. Nugent was prosecuted by Will County for the murder of his wife and acquitted by a jury. Alleging a conspiracy led by defendant Officer Hayes of the Will County Sheriff's Office, Mr. Nugent sues here for false arrest, malicious prosecution and intentional infliction of emotional distress. The defendants move for summary judgment, which I grant.

### I.

On the morning of August 6, 1996, Cheryl Nugent was found near death in her bed from a gunshot wound to the head. No suicide note was found, and the handgun which caused her injury belonged to her husband, Raymond Nugent, and was kept in a dresser drawer close to the bed with a loaded magazine by its side. Mrs. Nugent's four-year old daughter was apparently sleeping on the floor next to the bed when Cheryl was shot.

Sometime between 6:30 and 7:00 a.m. on August 6, 1996, Mr. Nugent called 911 and reported that he thought his wife shot herself in the back of the head. He also told the 911 operator that his wife had been really sick, he had knocked the gun out of her hand, and he did not think his three kids, who were in their bedrooms, heard the gunshot. According to Mr. Nugent's statement to the police, this day had started as any other. He awoke at 5:00 a.m., when the alarm sounded and Cheryl Nugent told him to get up and turn the alarm off before he woke up the entire household. She also asked him to wake her before he left so that she could prepare for her family's annual camping excursion to the state fair. Mr. Nugent shaved, made coffee, watched television, then went to the basement to retrieve a shirt. As he was coming from the basement, he heard a shot and ran upstairs. Upon entering his bedroom, Mr. Nugent found his wife lying on her stomach on the bed, head turned to the left, with a gun in her right hand, which was lying behind her. Mr. Nugent shook his wife, took the gun out of her hand, then called 911. Afterwards, he made sure his wife was clothed and placed her body the way she normally slept, on her right side, and covered her with blankets.

A policeman was apparently first to the scene and a paramedic arrived shortly thereafter, at approximately 6:48 a.m. When the paramedic began to evaluate and treat Mrs. Nugent, Mr. Nugent moved his daughter out of the paramedic's way and from the room. (He told the police that his daughter had come into the room in the middle of the night after having a bad dream.) The paramedic physically examined Cheryl Nugent's head, front and back, attempting to locate the gunshot wound, but could not find either the entry or exit wound. The police also could not locate the bullet's entry wound. When she was taken to the emergency room at Silver Cross Hospital, personnel in the emergency room who spoke with Officer Hayes and Officer Monson thought Mrs. Nugent might have been shot in her mouth. At the hospital, Mr. Nugent told Deputy Coroner Nick Lobello that Cheryl had never before attempted suicide. Mrs. Nugent died shortly after being taken to the hospital.

Patrick O'Neil was the Will County Coroner but not a medical doctor because in Will County, the position of Coroner is an elected position which does not require technical expertise. Therefore, Coroner O'Neil contacted Dr. Teas to perform the autopsy; her role was to determine the cause, not the manner, of death. She determined that the cause of death was a single gunshot wound which entered her

head at the base of her skull. The bullet entered the back of Cheryl Nugent's head 2 centimeters left of the midline, and the bullet was recovered under the left frontal region one centimeter left of the midline. Therefore, the bullet traveled in a left to right trajectory. Cheryl Nugent was right-handed.

On November 8, 1996, an Inquest was held to determine the manner and cause of Cheryl Nugent's death. During the inquest, Dr. Teas opined that although she believed the gunshot wound was consistent with self-infliction, it was "unusual" for a suicide—because most people who take their own life shoot themselves in the temple or mouth—and also consistent with a homicide. The weapon was an AMT .380 automatic or semiautomatic with a grip safety,[1] a slide safety and a trigger safety. Mrs. Nugent's family was adamant that Cheryl had never used or owned a gun, although Mr. Nugent apparently told the police that she had previously fired the weapon. They denied that Cheryl, who had been diagnosed with MS years earlier, was depressed or sick and pointed out that she was planning for the State Fair, which her family attended every year and was only two days away from her death. Cheryl's family also recounted some marital discord due to Ray's illegitimate child, who her mother said was conceived while Cheryl was pregnant with one of the couple's children. Her brother reported that Cheryl threatened to divorce Raymond if he agreed to a paternity test. After deliberation, the Coroner's Inquest jury concluded that the manner of Cheryl Nugent's death was undetermined.

A full investigation then ensued. Officer Edward Hayes was originally an evidence technician with the Sheriff's Department but was later promoted and very involved in this case. During the investigation, a number of facts were discovered which tended to cast suspicion on Mr. Nugent, not the least of which was the discovery that Mrs. Nugent maintained life insurance worth at least $800,000 naming her husband as the beneficiary.[2]

During the course of the investigation and before Mr. Nugent was indicted, four forensic pathologists were consulted regarding the unusual location of the wound. Dr. Blum was consulted by the State's Attorney's Office and stated initially that it was physically impossible to self-inflict this type of wound, but after seeing Dr. Teas' demonstration, he believed that it was physically possible, but did not rule out the possibility that someone else could have inflicted the wound. Dr. Rodriguez, a pathologist with the Armed Forces Institute of Pathology, opined that "the position of the self-inflicted gunshot is unusual, but not impossible." Finally, the State's Attorney's Office consulted with noted medical examiner and pathologist Dr. Cyril Wecht, who worked on the Kennedy assassination among other investigators.[3]

At the time of indictment, Dr. Wecht rendered his opinion that Mrs. Nugent's death was a homicide. Prior to the criminal trial, Prosecutor McCabe met with Dr. Wecht and reviewed all the materials relevant to his testimony, including the reports of the other pathologists. Dr. Wecht then conceded that suicide was not physically impossible, as he had previously thought, but he reiterated his conclusion that Mrs. Nugent's death was a homicide.

On November 19, 1997, a Grand Jury indicted Raymond Nugent for the first degree murder of Cheryl Nugent. He was arrested and released on bond that same day. After a jury trial, Raymond Nugent was acquitted on November 19, 1998. On March 3, 1999, Mr. Nugent sued defendants Edward Hayes and Coroner Patrick

---

1. A grip safety is a mechanism in the heel of the gun where the thumb would be placed which must be depressed before the trigger can be squeezed.

2. Although there is evidence of an additional policy for $100,000, for purposes of this mo-

tion, I will analyze the case assuming only the worth of the undisputed $800,000 policy.

3. Dr. Wecht was consulted due to his national reputation and because Coroner O'Neil attended a medical examiner's seminar at which Dr. Wecht was a speaker.

O'Neil for malicious prosecution, false arrest, conspiracy, intentional infliction of emotional distress, and Will County and Sheriff Ward for indemnification under 745 ILCS 10/9–102.

## II.

■ Mr. Nugent sues under 42 U.S.C. § 1983 for malicious prosecution, false arrest, and conspiracy to do the same by Officer Hayes and Coroner O'Neil. To succeed on a claim of malicious prosecution under § 1983, Mr. Nugent must show: (1) he has satisfied the requirements of a state law cause of action for malicious prosecution;[4] (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty. *Sneed v. Rybicki,* 146 F.3d 478, 480 (7th Cir.1998); *Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir. 1996).

■ The Seventh Circuit has consistently held that "the existence of probable cause for an arrest totally precludes any Section 1983 claim for unlawful arrest, false imprisonment or malicious prosecution, regardless of whether the defendant had malicious motives for arresting the plaintiff." *Mark v. Furay,* 769 F.2d 1266 (7th Cir.1985); *Meerbrey v. Marshall Field & Co.,* 139 Ill.2d 455, 474, 151 Ill. Dec. 560, 564 N.E.2d 1222 (1990) (same for Illinois causes of action). To survive summary judgment, Mr. Nugent must therefore demonstrate he was arrested without probable cause. Generally, an indictment by a grand jury is prima facie evidence of probable cause, *Bontkowski v. United States,* 28 F.3d 36, 37 (7th Cir.1994), but Mr. Nugent alleges that the indictment was a result of the deception of Officer Hayes and Coroner O'Neil, so I examine probable cause independent of the grand jury indictment. *Cervantes v. Jones,* 188 F.3d 805, 810 (7th Cir.1999).

Probable cause exists if "the facts and circumstances within the officer['s] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *Hughes v. Meyer,* 880 F.2d 967, 969 (7th Cir.1989); *Cervantes,* 188 F.3d at 811 (same with respect to prosecutor). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Gilbert,* 45 F.3d 1163, 1166 (7th Cir. 1995) (*quoting Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

Mr. Nugent claims that Officer Hayes enlisted Coroner Patrick O'Neil in an illegal exercise to manufacture evidence to arrest and prosecute Mr. Nugent for his wife's murder. These surreptitious activities allegedly included: (1) the coercion and manipulation of expert testimony, (2) concealing exculpatory evidence from prosecutors and the grand jury, and (3) making false representations to the prosecutors regarding Mr. Nugent's financial condition and other crucial facts.

Mr. Nugent charges that the "exculpatory" reports of three experts were concealed and that the lone expert who supported the defendants' witch-hunt was manipulated. But, although Mr. Nugent alleges that pressure was applied to Dr. Teas to amend her opinion, she denies that she did so; on the contrary, Dr. Teas gave her independent opinion to anyone who would listen, including the police, prosecutors, other pathologists, and the juries at both the inquest and Mr. Nugent's trial.[5] More importantly, even Dr.

---

4. Under Illinois law, the elements of malicious prosecution are that (1) the plaintiff was subject to judicial proceedings, (2) for which there was no probable cause, (3) the defendant instituted or continued the proceedings maliciously, (4) the proceedings were terminated in the plaintiff's favor, and (5) there was an injury. *Rybicki,* 146 F.3d at 480–81; *Reed,* 77 F.3d at 1051.

5. Dr. Teas physically demonstrated how the wound could have been self-inflicted many times and in front of the prosecutors, who also read her report, well before the indictment of Mr. Nugent.

Teas, the strongest advocate of the suicide theory, stated that it was absolutely possible that someone approached Mrs. Nugent and shot her: "She could be laying down and somebody could have come from her right and shot her, yes." The inconclusive, duplicative opinions of Dr. Blum and Dr. Rodriguez of the Armed Forces could not rule out either homicide or suicide and could not be deemed exculpatory. Moreover, the defendants did not conceal any of these opinions, which were reviewed by both of the prosecutors involved in the case.

 Mr. Nugent alleges that Hayes and O'Neil, recognizing the need for more damning forensic evidence to prosecute Mr. Nugent, went in search of another pathologist. This, in itself, is not suspicious or actionable. *See Buckley v. Fitzsimmons*, 20 F.3d 789, 796 (7th Cir.1994). However, Mr. Nugent claims that the defendants misled Dr. Wecht to procure his favorable expert report and testimony. Officer Hayes and Coroner O'Neil allegedly fed Dr. Wecht false information, namely (1) in a letter from Coroner O'Neil, that "there is some question as to whether the human body is capable of self-inflicting this particular gunshot wound," (2) that Mr. Nugent was indicted and there would be a trial at a time when there was not even an indictment, (3) withheld from him the crucial information regarding the conclusions of Dr. Teas, Dr. Blum and Dr. Rodriguez, and (4) misled him regarding the safety of the gun.

 There is no evidence that the opinion of Dr. Wecht, a noted expert with a national reputation who was paid in advance for his services, was tainted or misdirected by a single, rather innocuous line in a letter of introduction from a layman. Mr. Nugent also fails to show how the progress of the investigation or case would impact Dr. Wecht's work in any way. It is more likely that Officer Hayes was trying to expedite, not influence, Dr. Wecht's work. It was, moreover, proper to withhold the other experts' opinions until after Dr. Wecht finished his review and report, in order to ensure an independent opinion. Dr. Wecht, *after* completing his initial report but before meeting with the prosecutor, and before the indictment, did review the opinions of other experts, and largely stood by his conclusion. Finally, the primary source of the information Officer Hayes passed on about the weapon was the independent results of a laboratory; even if Officer Hayes misstated the results, Dr. Wecht's report clearly states that this information was not the basis for his opinion.

Mr. Nugent claims that statements by Assistant State's Attorney ("ASA") James Glasgow about his reluctance to try the case early on are admissions that no probable cause existed. They are not. ASA Glasgow testified that before Dr. Wecht's opinion was rendered, he would not have indicted Mr. Nugent because the forensic evidence could not rule out suicide and he had to prove the case beyond a reasonable doubt to win at trial.[6] There is an immense legal and practical difference between probable cause and proof beyond a reasonable doubt. "Probable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *See Maltby v. Winston*, 36 F.3d 548, 556 (7th Cir.1994); *see also Bostic v. City of Chicago*, 981 F.2d 965, 968 (7th Cir.1992) (probable cause does not require that an officer have evidence sufficient to establish guilt beyond a reasonable doubt). In addition, ASA Glasgow's professional judgment early in the investigation and months before the indictment is irrelevant. Prosecutor McCabe took over the case and determined that there was sufficient evidence, not only for probable cause, but to convene the grand jury to indict Mr. Nugent for the death of his wife, *after* he had

---

6. From the excerpts of the deposition submitted, ASA Glasgow was not questioned about whether probable cause existed nor did he testify in any way about probable cause.

reviewed the case file, expert reports, and interviewed key witnesses.

■ Mr. Nugent makes a legitimate argument that the investigation into his finances was incomplete and that its results misrepresented to the grand jury by Officer Hayes. While I agree that a more thorough financial review might have been performed, it was conducted by ASA Paul Passalano, a CPA and lawyer for the State's Attorney's office who was well qualified to do this. He reported directly to another ASA, not to Officer Hayes. ASA Passalano admits that he focused on Mr. Nugent's liabilities—which were considerable—and never finished his examination of Mr. Nugent's assets. However, during his review of bank statements, loan applications and other records, he came across no assets of significant value; he apparently told Officer Hayes as much and that Mr. Nugent rented and did not own his house or farming equipment. Therefore, Officer Hayes' grand jury testimony that Mr. Nugent was nearly bankrupt was premature given the state of the investigation, but was a reasonable inference based on ASA Glasgow's statements and may well have been true. Prosecutor McCabe, who conducted the grand jury proceeding, was well aware of ASA Passalano's findings, since he was working for and with him. Most importantly, the impact of this distinction on probable cause is inconsequential. Although ASA Passalano should have completed his financial review and Officer Hayes need not have overstated its results, Mr. Nugent admits to owing a large amount of debt. Whether Mr. Nugent had an overwhelming, desperate motive to kill his wife or a significant, pecuniary motive does not matter: the financial motive still exists.

■ Finally, Mr. Nugent makes much of the fact that Officer Hayes sought FBI assistance but never followed up on their suggestions. However, it is not the duty of the police to perform the perfect investi-

gation, and "one suspected of committing a crime has no constitutional right to an investigation by police which will uncover all exculpatory evidence." *Davis v. Owens*, 973 F.2d 574, 577 (7th Cir.1992). In fact, "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in hopes of uncovering potentially exculpatory evidence." *Id.* Practically speaking, the Will County Sheriff's Police Department is unlikely to have the resources of the FBI and should not be held to their standard.

■ The defendants deny that they performed anything other than an honest investigation and offer a number of facts and circumstances which led them to believe that Mr. Nugent killed his wife. Indeed, independent of the disputed evidence, I agree that there was probable cause to try Mr. Nugent for the murder of his wife. Mr. Nugent had the opportunity and means to commit the crime: he was in the house at the time of Cheryl's shooting and knew the location of and how to operate the gun he had purchased. Furthermore, he was able to correctly determine, in a dimly lit room, that Mrs. Nugent was shot in the back of the head when the medical experts could not determine this until much later. By the time the police arrived, Mr. Nugent had moved his wife's body, and the gun was not in her hand.[7] A neighbor told the police she heard the shot over a half hour before the police arrived, and others reported marital discord. Mr. Nugent admitted his wife was aware that he was likely the father of another woman's illegitimate child, who is mentioned in the couple's will. Mrs. Nugent did not leave a suicide note, and friends and family described her as upbeat before her death, feeling better, and happily preparing for her camping trip with her children—one of whom slept next to her bed when the fatal shot rang out. Mrs. Nugent's family vehe-

---

7. The gun was finished with a substance which prevented the detection of fingerprints; Mrs. Nugent's hands were washed, preclud- ing forensic or ballistic tests from being performed to determine if she had fired the gun.

mently denied that Cheryl would have allowed a gun in her home, within reach of her children. Her brother and mother stressed that she was terrified of guns and would not have wanted to learn to use one. She never told either of them that she and Mr. Nugent had purchased a gun to protect the home. In addition, Mr. Nugent had a pecuniary motive to kill his wife: to collect on the at least $800,000 life insurance policy she had taken out naming Mr. Nugent as the primary beneficiary,[8] particularly since he owed over $200,000 to just one creditor. Finally, the defendants found the unusual nature of the wound suspicious, and Dr. Wecht's conclusion that the shooting was a homicide corroborated their suspicion.

Even excluding all of the evidence Mr. Nugent claims is tainted or concocted and including all of the evidence that Mr. Nugent believes is exculpatory, the remaining evidence and testimony establishes probable cause to believe that Mr. Nugent, who "had the means, motive and opportunity to commit first degree murder," did in fact kill his wife and the mother of his children. *Schertz v. Waupaca County*, 683 F.Supp. 1551, 1565 (E.D.Wis. 1988). Therefore, his arrest and prosecution was lawful.

### IV.

■ Mr. Nugent also claims that the alleged conspiracy constituted intentional infliction of emotional distress. Under Illinois law, to state a claim for intentional infliction of mental suffering, a plaintiff must show (1) the conduct involved was truly extreme and outrageous, (2) the defendant intended that his conduct inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress. *Doe v. Calumet City*, 161 Ill.2d 374, 204 Ill.Dec. 274, 641 N.E.2d 498, 506 (1994).

■ The defendants claim that Mr. Nugent's claim must fail because he fails to allege sufficiently outrageous conduct that was calculated to cause severe emotional distress to a person of ordinary sensibilities. I agree. The Illinois Supreme Court, as well as the Seventh Circuit, has set a very high threshold for conduct which constitutes a violation of this intentional tort. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1976), and the distress inflicted so severe that no reasonable person could be expected to endure it. *McGrath v. Fahey*, 126 Ill.2d 78, 86, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988); *see also Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

The record of Officer Hayes' and Coroner O'Neil's investigation and conduct falls well short of the type of outrageousness required. Mr. Nugent has not alleged that he was framed in any conventional sense: no evidence was planted, no material perjury occurred, and no exculpatory evidence was withheld from the prosecutors who ultimately made the decision to bring the case to the grand jury. Conduct is extreme and outrageous where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Calumet City*, 161 Ill.2d at 392, 204 Ill.Dec. 274, 641 N.E.2d 498, quoting Restatement (Second) of Torts § 46, Comment d, at 73 (1965). This is not such a case. Searching for an expert to support his theory of the crime and exaggerating to the grand jury on relative-

---

**8.** The plaintiff argues that Officer Hayes lied about Mr. Nugent's brother obtaining the insurance for Cheryl. Even if this is true, the source of the life insurance policy is irrelevant. The key, which is undisputed, is that Mr. Nugent knew his wife had life insurance policies worth over $800,000 which named him as the beneficiary. It was not unreasonable of Officer Hayes to believe that this considerable sum was sufficient financial incentive to constitute a motive.

ly immaterial items that he did not know were true for a fact, but he did not know were untrue either, are simply not enough.

### V.

Because Mr. Nugent cannot establish that there was no probable cause for his arrest and indictment and because the conduct he alleges does not rise to the level required for intentional infliction of emotional distress, summary judgment is GRANTED in favor of the defendants. Mr. Nugent's motion to compel is therefore DENIED as moot.